**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **TERESA J. POWERS-WHITE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:05CV216ERW (LMB)** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Teresa J. Powers-White for a Period of Disability and Disability

Insurance Benefits under Title II of the Social Security Act.  The cause was referred to the

undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28

U.S.C. § 636 (b).  Plaintiff has filed a Brief in Support of Complaint (Document Number 8).

Defendant has filed a Brief in Support of the Answer.  (Doc. No. 9).

**Procedural History**

On June 9, 2003, plaintiff filed her application for a Period of Disability and Disability

Insurance Benefits, claiming that she became unable to work due to her disabling condition on

May 30, 2003.  (Tr. 56-59).  This claim was denied initially, and following an administrative

hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ),

dated April 5, 2005.  (Tr. 26-30, 17-25).  Plaintiff then filed a request for review of the ALJ's

decision with the Appeals Council of the Social Security Administration (SSA), which was denied on October 12, 2005. (Tr. 12-13, 6-9). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A. ALJ Hearing

Plaintiff's administrative hearing was held on January 19, 2005. (Tr. 242). Plaintiff was present and was represented by counsel. (Id.). The ALJ noted that a vocational expert, Jeffrey Magrawski, was present. (Tr. 243). Plaintiff's attorney indicated that he had just recently become involved in the matter and requested that he be given an opportunity to submit additional medical records. (Tr. 244). The ALJ stated that he would leave the record open for 60 days after the hearing to allow plaintiff to obtain additional medical records. (Id.). The ALJ admitted a number of exhibits into the record. (Tr. 245).

The ALJ then examined plaintiff, who testified that she was 42 years of age and that she had completed high school. (Tr. 247). Plaintiff stated that she worked for the Missouri Department of Transportation (MODOT) from 1998 to 2003, performing maintenance and operating heavy equipment. (Tr. 248). Plaintiff testified that she drove dump trucks containing asphalt. (Id.). Plaintiff stated that she also operated tractors and backhoes. (Id.). Plaintiff testified that she had a special driver's license, a CDL, which was required to operate the dump truck. (Id.). Plaintiff stated that she lifted 25 to 50 pounds at this position. (Tr. 249).

Plaintiff testified that she alleged an onset of disability date of May 30, 2003, because she stopped working on that date when her employer told her they could not accommodate her. (Id.).

Plaintiff testified that she injured her cervical spine[1] at C5-6[2] and underwent neck surgery.  (Id.).  The ALJ noted that plaintiff received workers' compensation benefits until March of 2003, at which time it was determined that plaintiff could return to work lifting up to 25 pounds.  (Tr. 250).

 Plaintiff's attorney then questioned plaintiff, who testified that she was on light duty and was working in the office at MODOT at the time she stopped working.  (Id.).  Plaintiff stated that her employer placed her on light duty after she sustained a fall.  (Id.).  Plaintiff testified that the light duty office work involved filing papers and working on the computer for eight hours a day.  (Tr. 251).  Plaintiff stated that she was able to perform this work on some days, although she experienced constant neck pain.  (Id.).

Plaintiff testified that she had to reposition herself to relieve her neck pain.  (Tr. 252).  Plaintiff rated the pain she experienced when performing light duty work as an eight on a scale of one to ten.  (Id.).  Plaintiff testified that the pain she experienced was a throbbing pain, which felt like needles poking her in the neck.  (Id.).  Plaintiff stated that the pain started when she woke up in the morning and gradually became worse.  (Tr. 252-53).  Plaintiff testified that her pain reached a level eight in severity after working for about two hours.  (Tr. 253).  Plaintiff stated that she

---

[1]The back is comprised of the cervical, thoracic and lumbar regions.  In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra.  The coccyx, or tail bone, lies below the sacrum.  See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

[2]Abbreviation for cervical vertebra (C1-C7).  Stedman's Medical Dictionary, 265 (27th Ed. 2000).

would stand up and move around for 15 to 20 minutes and use her TENS unit[3] and heating pad when her pain reached this level. (Id.). Plaintiff testified that these methods reduced her pain to a level six in severity. (Tr. 254). Plaintiff stated that she took prescription pain medication when she was working. (Id.). Plaintiff testified that she was prescribed a TENS unit after her neck fusion surgery. (Id.). Plaintiff stated that the TENS unit significantly reduced her pain. (Tr. 255).

Plaintiff testified that on May 30, 2003, MODOT told her that there were no jobs she could perform with her limitations. (Id.). Plaintiff stated that she has not looked for other work since then. (Id.).

Plaintiff testified that she has been receiving medical care from her family practitioner, Dr. Heeth, since she stopped working. (Id.). Plaintiff stated that Dr. Allan C. Gocio, who performed her first surgery, told her in 2002 that she could undergo surgery again as a result of the second injury she sustained. (Tr. 256). Plaintiff explained that she sustained two separate injuries while working for MODOT. (Tr. 257). Plaintiff testified that the first injury occurred in June of 1999, when she was hit by a truck. (Id.). Plaintiff stated that she underwent neck surgery as a result of this injury and subsequently returned to work at MODOT. (Id.). Plaintiff testified that the second injury occurred in June of 2002, after which she was placed on light duty until she stopped working in May of 2003. (Tr. 258). Plaintiff stated that she did not believe she was more limited at the time of the hearing than she was when she stopped working in May of 2003. (Id.).

Plaintiff then described her daily activities. (Tr. 259). She stated that she wakes up at

---

[3]Acronym for "Transcutaneous Electrical Nerve Stimulator," a method of pain relief achieved by the application of minute electrical impulses to nerve endings. See The American Medical Association Encyclopedia of Medicine, 1003 (1989).

about 6:30 a.m., drinks coffee, and watches television until about 10:00 a.m.  (Id.).  Plaintiff

testified that she then makes the beds, cooks breakfast for her children, and does her laundry.

(Id.).  Plaintiff stated that she experiences burning, aching pain in her neck when she cooks.  (Id.).

 Plaintiff testified that she finds it difficult to hold her head up due to her neck pain.

(Tr. 260).  Plaintiff stated that she was holding her neck up with her hand during the hearing to

take the weight off her neck.  (Id.).  Plaintiff testified that she stands at the stove for 20 to 30

minutes to cook breakfast for her children.  (Id.).  Plaintiff stated that she sits down for 10 to 15

minutes after cooking to relieve her neck pain, and then she washes the dishes.  (Tr. 261).

Plaintiff testified that she experiences constant pain when performing these activities.  (Id.).

Plaintiff stated that after she performs these chores, she sits in her recliner with her feet

propped, which relieves her pain.  (Tr. 262).  Plaintiff testified that she generally sits in her

recliner for about 30 minutes between the time she wakes up in the morning to noon.  (Tr. 263).

Plaintiff stated that she then prepares lunch, which takes 30 minutes to an hour and consists of

cooking, baking, and frying.  (Tr. 263-64).  Plaintiff testified that she experiences pain at a level of

severity of five to six with medication and eight to nine with no medication, after cooking lunch.

(Tr. 264).  Plaintiff stated that she performs other household chores until 5:00 p.m., at which time

she sits in her recliner because she can no longer tolerate the pain.  (Tr. 263-65).

Plaintiff stated that she takes Aleve, an over-the-counter pain medication; Ultram;[4] and

Flexeril[5] for her pain.  (Tr. 261).  Plaintiff testified that the Ultram reduces her pain significantly

---

[4]Ultram is indicated for the management of moderate to moderately severe chronic pain.
See Physician's Desk Reference (PDR), 2392-93 (61st Ed. 2007).

[5]Flexeril is indicated for the relief of muscle spasm associated with acute, painful
musculoskeletal conditions.  See Physician's Desk Reference (PDR), 1930-31 (59th Ed. 2005).

but it also causes her to become drowsy.  (Id.).  Plaintiff testified that she uses the TENS unit almost every day, which provides substantial relief, bringing her pain to a level of severity of five to six.  (Tr. 264).

Plaintiff testified that she did not believe she could perform any activity standing up for eight hours a day, even if she were given fifteen-minute breaks in the morning and afternoon and a thirty-minute lunch break.  (Tr. 265).

Plaintiff stated that she had been experiencing numbness and tingling in her arms and fingers since her first accident, which worsened after her second accident.  (Tr. 265-66).  Plaintiff testified that her non-dominant left arm is worse than her right arm.  (Tr. 266).  Plaintiff stated that her doctors have not indicated that there is anything they can do for this condition.  (Id.).  Plaintiff testified that she experiences numbness in the fingers and hand of her right arm and up to the elbow of her left arm.  (Tr. 267).  Plaintiff stated that she experiences this numbness almost every day, although it does not limit her in any way.  (Tr. 268).

Plaintiff testified that she has also been experiencing headaches every day since her first accident.  (Tr. 269).  Plaintiff stated that her headaches vary in severity, with severe ones occurring two to three times a week.  (Tr. 270).  Plaintiff testified that she takes Aleve to relieve her headaches.  (Id.).  Plaintiff stated that the headaches sometimes resolve after she takes Aleve.  (Id.).

Plaintiff testified that she has not spoken with her doctors about the drowsiness she experiences from taking her pain medication.  (Tr. 271).  Plaintiff stated that she experiences drowsiness about four days a week.  (Id.).  Plaintiff testified that she is still able to complete her housework on the days that she is drowsy.  (Id.).

Plaintiff stated that she does not carry heavy containers of detergent because it causes her neck and arms to hurt. (Id.). Plaintiff testified that her neck pain increases when she bends from the waist. (Tr. 272). Plaintiff stated that she can stoop and squat in a way that does not cause pain. (Tr. 273). Plaintiff testified that she can lift bags of groceries that weigh more than a gallon of milk, although she experiences pain when doing so. (Id.). Plaintiff stated that her neck pain increases when she sits or stands for long periods. (Tr. 274). Plaintiff testified that she shops for two to three hours at a time, after which she experiences significant pain. (Id.). Plaintiff stated that she sits in her recliner with her feet propped to relieve her pain. (Tr. 275). Plaintiff testified that she was experiencing an aching, burning pain in her neck at the hearing as a result of sitting for a prolonged period. (Id.).

The ALJ then questioned plaintiff, who testified that her workers' compensation case ended in March of 2003 and that she is not involved in any other litigation. (Id.). Plaintiff stated that she stopped working in May of 2003 because MODOT said they did not have any light work that she could perform. (Tr. 276). Plaintiff testified that she could probably perform light work and that she was willing to try to work a full day. (Id.). Plaintiff stated that during the year prior to the time she stopped working, she worked five days a week and did not miss work. (Id.). Plaintiff explained that she was given breaks throughout the day, during which she could sit down and stretch. (Id.).

Plaintiff testified that in an average day, she sits in her recliner to relieve pain four or five times for periods of ten to thirty minutes. (Tr. 277). Plaintiff stated that she has two sons, aged seventeen and fourteen, who take care of themselves. (Id.). Plaintiff testified that she has medical insurance through her husband's job. (Id.). Plaintiff stated that her treating physician is Dr.

- 7 -

Heeth, a family doctor.  (Id.).  Plaintiff testified that she sees Dr. Heeth for treatment of her neck.  (Id.).  Plaintiff stated that she is not receiving any treatment for depression or anxiety.  (Tr. 278).

Plaintiff testified that she worked as a tree trimmer when she and her husband owned a business.  (Tr. 279).  Plaintiff stated that she assisted with the business by cleaning up debris, performing payroll duties, and giving estimates.  (Tr. 280).  Plaintiff explained that she mainly performed paperwork for the business.  (Id.).  Plaintiff stated that she worked about four hours a day for the business.  (Tr. 281).

The ALJ then examined the vocational expert, Dr. Jeffrey Magrawski, who classified the work plaintiff performed for her husband's business as light and semi-skilled.  (Id.).  Dr. Magrawski testified that plaintiff's work for MODOT would be classified as medium and semi-skilled.  (Id.).  Dr. Magrawski stated that the office work plaintiff performed for MODOT would be classified as sedentary and semi-skilled.  (Tr. 282).

The ALJ then asked Dr. Magrawski whether a person the same age and with the same background as plaintiff who was limited to light exertional activity and occasional bending, stooping and twisting could perform any of plaintiff's past work.  (Tr. 283).  Dr. Magrawski testified that such an individual could perform the data entry work and the file clerk work.  (Id.).  The ALJ next asked Dr. Magrawski to add the limitation that the individual would require up to four unscheduled work breaks lasting up to thirty minutes at a time.  (Id.).  Dr. Magrawski testified that such an individual would not be able to perform any jobs with these limitations.  (Tr. 283-84).

The ALJ indicated that he would leave the record open to allow plaintiff to obtain

- 8 -

additional medical records.  (Tr. 284).

**B.**     **Relevant Medical Records**

The record reveals that plaintiff presented to neurosurgeon Allan C. Gocio for evaluation

of her neck pain on October 4, 2000.  (Tr. 117-18).  Dr. Gocio's impression was cervical disc

herniation with nerve root compression.  (Tr. 118).  A cervical CT scan and cervical myelogram[6]

revealed nerve root compression at C5-6 and spondylosis[7] due to plaintiff's injury.  (Tr. 115).  Dr.

Gocio recommended cervical fusion.  (Id.).

On April 6, 2001 Dr. Gocio noted that plaintiff was still experiencing some neck pain after

undergoing surgery.  (Tr. 114).  Dr. Gocio prescribed physical therapy and Ultram.  (Id.).  He

noted that plaintiff was working without restrictions at that time.  (Id.).  On July 3, 2001, plaintiff

continued to complain of neck pain.  (Tr. 112).  On August 1, 2001, Dr. Gocio reported that a

cervical myelogram and CT revealed no root or cord compression and excellent healing at the C5-

6 level.  (Tr. 107).  Dr. Gocio recommended conservative treatment, including epidural steroid

injections and trigger point injections.  (Id.).  On July 16, 2002, plaintiff reported the same

symptomatology.  (Tr. 106).  Dr. Gocio placed plaintiff on light duty at this time.  (Id.).  On

September 18, 2002, plaintiff continued to complain of neck pain.  (Tr. 105).  Dr. Gocio noted

that plaintiff had undergone physical therapy the previous month, which was of little benefit.

(Id.).  Dr. Gocio stated that Ultram and Flexeril seemed to help plaintiff.  (Id.).

Plaintiff saw neurologist Scott R. Gibbs on October 15, 2002 for an evaluation of her neck

---

[6]Radiographic contract medium introduced directly into the cervical subarachnoid space.
See Stedman's at 1171.

[7]Stiffening of the vertebra; often applied nonspecifically to any lesion of the spine of a
degenerative nature.  See Stedman's at 1678.

and left arm pain. (Tr. 137-41). Plaintiff reported that on June 11, 2002, while working, she fell out of a truck and landed on her hands and knees. (Tr. 137). Plaintiff indicated that she was currently working at MODOT with a twenty-pound lifting restriction. (Tr. 138). Plaintiff's medications were listed as Ultram and Flexeril. (Id.). Plaintiff reported an aching sensation in the frontal forehead, bilateral inner arms, cervical spine and interscapular area. (Id.). She also reported burning, pins and needles and stabbing sensation in the cervical and interscapular area. (Id.). Upon physical examination, Dr. Gibbs found that plaintiff had full strength in all major muscle groups, normal sensation, and a normal gait. (Tr. 139). Plaintiff had 75 percent flexion in all directions of the neck and her flexion and extension of the back were within normal limits. (Tr. 140). Dr. Gibbs' impression was cervical whiplash status post motor vehicle accident in 1999, status post C5-6 cervical disc fusion in 2000 with intermittent resolution of neck pain that is aggravated with activities, and transient exacerbation of recurrent neck strain. (Id.). Dr. Gibbs recommended imaging and physical therapy. (Tr. 141). Dr. Gibbs released plaintiff to perform sedentary to light work with no driving of a heavy/work truck and no use of a jack hammer. (Tr. 135).

Plaintiff saw Dr. Gibbs again on January 24, 2003. (Tr. 130-32). Upon physical examination, Dr. Gibbs found that plaintiff had full strength in all major muscle groups, normal sensation in her arms and legs, and a normal gait. (Tr. 131). Dr. Gibbs' impression was neck pain and occipital[8] headaches. (Id.). He noted that plaintiff's TENS unit provided some benefit to her. (Id.). Dr. Gibbs expressed the opinion that plaintiff had reached maximum medical improvement for occipital headaches and neck and left arm pain. (Id.). He released plaintiff to perform light

---

[8]Referring to the occipital bone or to the back of the head. Stedman's at 1250.

work with no driving of a heavy/work truck or use of a jack hammer. (Tr. 136).

On February 11, 2003, plaintiff underwent a functional capacity evaluation at Mid America Rehab. (Tr. 206-12). It was found that plaintiff could lift from the floor to shoulder level 25 pounds occasionally and 10 pounds frequently, overhead lift 22 pounds occasionally and 10 pounds frequently, carry 25 pounds occasionally and 10 pounds frequently, sit occasionally, stand constantly, and walk frequently. (Tr. 206).

On March 25, 2003, Dr. Gibbs released plaintiff to perform light work, with no repetitive bending, stooping, or twisting. (Tr. 128).

Plaintiff underwent an Impairment Rating Evaluation at Spine & Pain Center of Missouri, Inc. on November 17, 2003. (Tr. 218-22). Gary D. Eaton, D.O. expressed the opinion that plaintiff had the following permanent restrictions: no use of a jackhammer, no driving heavy trucks, no lifting greater than 20 pounds with the left upper extremity, no bilateral lifting greater than 40 pounds, limited keyboard use and repetitive motion, reduced repetitive gripping with the left upper extremity, push limit of 20 pounds, pull limit of 20 pounds, and forward reach from the umbilicus not to exceed arm length. (Tr. 222). Dr. Eaton also noted that plaintiff would require maximum ergonomic adaptations to include padded adjustable arm supports, padded wrist rests, ergonomic keyboard, adjustable viewing screen height, adjustable foot rests, and padded seat surface with adjustable cervical support. (Id.). Finally, Dr. Eaton found that plaintiff should not carry loads that require balancing on her head nor excessive flexion or extension of her neck. (Id.). Dr. Eaton stated that plaintiff's "combination of disabilities, limited education and training are significant impediments to employment or re-employment." (Id.). Dr. Eaton concluded that plaintiff was totally and permanently disabled. (Id.).

In a letter dated June 24, 2004, Daniel Phillips, M.D. indicated that a nerve conduction study plaintiff underwent was consistent with moderate right sensory motor median neuropathy across the carpal tunnel and milder left median sensory neuropathy across the carpal tunnel. (Tr. 227). Dr. Phillips stated that the study was not impressive for active cervical radiculopathy. (Id.).

Plaintiff underwent a CT scan of the cervical spine on June 25, 2004. (Tr. 232). No central canal stenosis[9] or degenerative encroachment upon the nerve root canal was found. (Id.). Minimal degenerative facet changes were present from C3-4 through C7-T1. The impression of the reviewing physician was status post instrumentation and fusion procedure at C5-6. (Id.).

In a letter dated July 27, 2004, David G. Kennedy, M.D. stated that, after reviewing plaintiff's Functional Capacity Evaluation and the results of her June 25, 2004 CT scan, it was his opinion that plaintiff had reached maximum medical improvement. (Tr. 234).

### The ALJ's Determination

The ALJ made the following findings:

1.    The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.    The claimant's degenerative disc disease of the C5-6, status post fusion with no nerve root compression is a "severe" impairment, based upon the requirements in the Regulations (20 CFR § 404.1520(c)).

4.    This medically determinable impairment does not meet or medically equal one of

_____

[9]Narrowing of the spinal canal. See Stedman's at 1695.

- 12 -

the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.      The claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.      The claimant has the residual functional capacity to perform a "limited range of light", with occasional bending, stooping and twisting.

7.      The claimant's past relevant work as data entry clerk/office clerk, DOT #203.582-054, sedentary, semi-skilled exertional level work did not require the performance of work-related activities precluded by her newly assessed residual functional capacity (20 CFR 404.1565).

8.      The claimant's medically determinable degenerative disc disease of the C5-6, status post fusion with no nerve root compression does not prevent the claimant from performing her past relevant work.

9.      The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR 404.1520(f)).

(Tr. 24-25).

The ALJ's final decision reads as follows:

It is my decision that, based on the application filed on June 9, 2003, the claimant is not entitled to a period of disability or Disability Insurance Benefits under Sections 216(i) and 223, respectively, of the Social Security Act.

(Tr. 25).


## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel,

222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v.

Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the Commissioner's

findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th

Cir. 1992).  The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court

must also take into consideration the weight of the evidence in the record and apply a balancing

test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878

(8th Cir. 1998).

### B.    The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of

not less than 12 months."  42 U.S.C. § 416 (i) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant

has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d

598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a

person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-

42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895

(8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial

gainful employment."  If the claimant is, disability benefits must be denied.

See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at

which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform

other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059

(8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants

with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure

must be followed at each level of administrative review.  See id.  Previously, a standard document

entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this

special procedure, had to be completed at each level and a copy had to be attached to the ALJ's

decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e),

416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000).  Application of the special procedures

required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§

404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a,

416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms,

findings, functional limitations, and effects of treatment" in the case record to assist in the

determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1),

416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must

indicate whether medical findings "especially relevant to the ability to work are present or absent."

20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree

of functional loss resulting from the impairments in four areas deemed essential to work:

activities of daily living, social functioning, concentration, and persistence or pace.  See

20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges

from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

**C.**     **Plaintiff's Claims**

Plaintiff raises two claims on appeal of the decision of the Commissioner.  Plaintiff first argues that the ALJ erred in discrediting her subjective complaints of pain and limitations. Plaintiff next argues that the hypothetical question the ALJ posed to the vocational expert was deficient.


**1.**     **Credibility Analysis**

Plaintiff argues that the ALJ erroneously found her subjective complaints of pain and limitation not credible.  Related to this claim, plaintiff contends that the ALJ erred in assigning no weight to the opinion of consulting physician Dr. Eaton and that the ALJ failed to properly develop the record.  Defendant contends that the ALJ's credibility determination is supported by substantial evidence on the record as a whole.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320,1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322. See also Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when she claims that [the pain] hurts so much that it prevents her from engaging in her prior work." Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent her from working are credible.

In his opinion, the ALJ cited the relevant regulations and then pointed out Polaski factors

and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. (Tr. 21-23). The ALJ first stated that the medical evidence does not support plaintiff's subjective complaints. (Tr. 21). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003). The ALJ first discussed the findings of Dr. Gibbs, plaintiff's treating neurologist. (Tr. 22). On October 15, 2002, Dr. Gibbs found that plaintiff had full strength in all major muscle groups, normal sensation, and a normal gait. (Tr. 139). Dr. Gibbs released plaintiff to perform sedentary to light work with no driving of heavy trucks and no use of jack hammers. (Tr. 135). On January 24, 2003, Dr. Gibbs released plaintiff to perform light work, with no driving of heavy trucks and no use of jack hammers. (Tr. 136). On March 25, 2003, Dr. Gibbs released plaintiff to perform light work, with no repetitive bending, stooping, or twisting. (Tr. 128). The fact that plaintiff's treating physician released plaintiff to perform light work detracts from plaintiff's subjective complaints of disabling pain. See Forte v. Barnhart, 377 F.3d 892, 896 (8th Cir. 2004).

The ALJ next discussed the findings of Dr. Eaton. (Tr. 22). Plaintiff saw Dr. Eaton for a consultative examination on November 17, 2003. (Tr. 218-22). Dr. Eaton expressed the opinion that plaintiff had the following permanent restrictions: no use of a jackhammer, no driving heavy trucks, no lifting greater than 20 pounds with the left upper extremity, no bilateral lifting greater than 40 pounds, limited keyboard use and repetitive motion, reduced repetitive gripping with the left upper extremity, push limit of 20 pounds, pull limit of 20 pounds, and forward reach from the umbilicus not to exceed arm length. (Tr. 222). Dr. Eaton stated that plaintiff's combination of

impairments, limited education and training were significant impediments to employment. (Tr. 222). He thus concluded that plaintiff was totally and permanently disabled. (Id.). The ALJ found that Dr. Eaton's statements regarding plaintiff's employability were opinions on an issue reserved to the Commissioner and were therefore not entitled to controlling weight. The ALJ indicated that he had considered Dr. Eaton's assessments and had given them no weight in determining plaintiff's disability. (Tr. 22). Plaintiff contends that the ALJ erred in assigning no weight to Dr. Eaton's opinion.

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). By contrast, "[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (quoting Kelley, 133 F.3d at 589).

Here, Dr. Eaton was a consulting physician who examined plaintiff once. Dr. Eaton's opinion was inconsistent with the medical record, including the opinion of plaintiff's treating neurologist, Dr. Gibbs. Further, Dr. Eaton expressed an opinion on plaintiff's employability, which is an issue reserved to the Commissioner. As such, the ALJ articulated sufficient reasons for according no weight to Dr. Eaton's assessment.

The ALJ next addressed the findings of Dr. Kennedy. (Tr. 23). Dr. Kennedy stated that, after reviewing plaintiff's Functional Capacity Evaluation and the CT scan taken on June 25,

2004, it was his opinion that plaintiff had reached maximum medical improvement.  (Tr. 234).

The ALJ concluded that plaintiff has degenerative disc disease of the cervical spine, is status post

C5-6 cervical fusion, but has no significant neurological involvement.  (Tr. 23).  This conclusion is

supported by the objective medical evidence.

Plaintiff contends that the ALJ failed to properly develop the record because the records

of her family physician, Dr. Heeth, were not included in the record.  While an ALJ has the duty to

develop the record independent of the claimant's burden, the burden of persuasion to prove

disability remains on the claimant.  See Eichelberger v. Barnhart, 390 F.3d 584, 592 (8th Cir.

2004).  Here, no crucial issue was left undeveloped.  There was ample medical evidence in the

record for the ALJ to review in making his determination.  Further, the ALJ informed plaintiff at

the conclusion of the hearing that he was leaving the record open to allow plaintiff to submit

additional medical evidence.  (Tr. 284).  Although plaintiff did submit additional evidence, she did

not provide any records from Dr. Heeth.  Thus, the ALJ fulfilled his duty to develop the record.

The ALJ next discussed plaintiff's testimony at the hearing.  (Id.).  The ALJ noted that

plaintiff's pain medication reduced her pain from a level eight in severity to a level five to six.  (Tr.

254, 264).  Plaintiff also testified that the TENS unit provided significant pain relief.

(Tr. 255).  Evidence of effective medication resulting in relief may diminish the credibility of a

claimant's complaints.  See Rose v. Apfel, 181 F.3d 943, 944 (8th Cir. 1999).  The ALJ pointed to

plaintiff's testimony that she was able to work on light duty for a year after re-injuring her back.

(Tr. 250-52).  The fact that a claimant worked successfully for a significant period of time with his

or her impairments is inconsistent with a claim of disabling pain.  See Orrick v. Sullivan, 966 F.2d

368, 370 (8th Cir. 1992).  In fact, upon questioning by the ALJ, plaintiff testified that she would be

willing to try to perform light-duty work on a full-time basis.

(Tr. 276).

The ALJ also discussed plaintiff's behavior and demeanor at the hearing. He noted that plaintiff had no apparent difficulty sitting, standing, walking or testifying at the hearing. (Tr. 23). He further noted that plaintiff appeared relaxed and that her testimony was spontaneous. (Id.). The ALJ stated that he was not basing his decision on plaintiff's appearance and demeanor at the hearing but rather, it was just one factor that he had considered. (Tr. 23). "The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations." Johnson, 140 F.3d at 1147-48.

Finally, the ALJ noted that plaintiff's ongoing involvement in the workers' compensation process raised the issue of secondary gain with regard to her alleged limitations. (Tr. 23). The element of secondary gain is an appropriate consideration in determining a claimant's credibility. See Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir. 1996).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). Each and every Polaski factor, however, need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not entirely credible is supported by substantial evidence.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

**2.      Hypothetical Posed to the Vocational Expert**

Plaintiff argues that the hypothetical question relied on by the ALJ failed to include all of

her limitations.  Specifically, plaintiff contends that the ALJ failed to include the fact that

plaintiff's prescription medication causes drowsiness and that plaintiff suffers from headaches and

carpal tunnel syndrome.[10]  Defendant argues that the ALJ properly included the limitations that he

found to be credible.

Testimony from a vocational expert based on a properly phrased hypothetical question

constitutes substantial evidence upon which to base an award or denial of Social Security benefits.

See Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001).  "A hypothetical question posed to

[a] vocational expert is sufficient if it sets forth impairments supported by substantial evidence in

the record and accepted as true by the ALJ."  Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir.

2001).  It must "capture the concrete consequences of the claimant's deficiencies."  Id. (citing

Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997)).

The ALJ posed the following hypothetical question to the vocational expert, Dr.

Magrawski:

> [A]ssume that we have an individual the same age, education, and work history as the
> Claimant.  Younger individual, high school education, and the work as you described.
> For the first hypothetical, the person would be limited to light exertional activity, and
> there would be occasional bending, stooping, and twisting.  And with those limitations
> alone, could such a person perform any of the past work that you described?

(Tr. 283).  Dr. Magrawski responded that plaintiff could perform data entry work and file clerk

work.  (Id.).

---

[10]The most common nerve entrapment characterized by nocturnal hand paresthesia and
pain, and sometimes sensory loss and wasting in the median hand distribution.  Stedman's at
1749.

The undersigned finds that the hypothetical question relied upon by the ALJ is supported by substantial evidence in the record. The hypothetical mirrors the limitations found by plaintiff's treating neurologist, Dr. Gibbs. (Tr. 128). Plaintiff contends that the hypothetical question did not account for her headaches, drowsiness, or carpal tunnel syndrome. As discussed above, however, the ALJ conducted a proper credibility analysis and found plaintiff's allegations regarding her impairments were not entirely credible.

Notably, these impairments were present when Dr. Gibbs found that plaintiff was capable of performing light work. In addition, plaintiff successfully performed light work for a year with the impairments. Further, plaintiff's testimony is inconsistent with her allegations regarding these impairments. Plaintiff testified that the numbness and tingling she experienced from the carpal tunnel syndrome does not limit her in any way. (Tr. 268). With regard to her headaches, plaintiff testified that she takes Aleve, which provides significant relief and commonly causes the headaches to resolve completely. (Tr. 270). Finally, plaintiff testified that she has not complained of drowsiness to her physicians and that the drowsiness does not prevent her from completing household chores. (Tr. 271). Thus, the ALJ's hypothetical question is supported by substantial evidence. Dr. Magrawski's response to this question likewise constitutes substantial evidence supporting the ALJ's decision.

Accordingly, the undersigned recommends that the decision of the Commissioner be affirmed as to this point.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying plaintiff's applications for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act be **affirmed**.

The parties are advised that they have eleven (11) days, until February 2, 2007, in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this \_\_\_22nd\_\_ day of January, 2007.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE